**INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 97–1549.**

United States Court of Appeals, Federal Circuit.

July 24, 1998.

---

William D. Outman, II, Baker & McKenzie, Washington, DC, argued for plaintiff-appellant. With him on the brief were Teresa A. Gleason, and Michael E. Murphy.

John J. Mahon, Attorney, Civil Division, Commercial Litigation Branch, International Trade Field Office, U.S. Department of Justice, New York City, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director, U.S. Department of Justice, Washington, DC, and Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office. Of counsel was Mark G. Nackman, Attorney, Office of Assistant Chief Counsel, U.S. Customs Service, New York City.

Before LOURIE, Circuit Judge, ARCHER, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

On summary judgment, the United States Court of International Trade upheld the United States Customs Service's (Customs')

classification of certain disk drives and controllers imported by International Business Machines Corporation (IBM). *See IBM v. United States*, 968 F.Supp. 736 (C.I.T.1997). Because Customs incorrectly classified the merchandise as "[o]ffice machines not specially provided for," rather than "[p]arts of automatic data-processing machines and units thereof," this court reverses.

## I.

In the 1980s, IBM imported disk drives ("Direct Access Storage Drives," model nos. 7777–B01 and 9335–B01) and controllers for those drives ("Device Function Controllers," model nos. 7777–A01, 9335–A01, and 9335–A02). Both the drives and controllers are components of the IBM model 9335 Direct Access Storage System, which in turn provides fixed-disk storage for an automatic data processing system, the IBM A/S 400. The Direct Access Storage System consists of one controller and from one to four drives, all contained within a rack enclosure. The picture below illustrates how the controllers and drives slide into the rack mechanism: [1]

**Slide Locking Tab**

In operation, the controller directs the drives to store and retrieve data in response to requests by the IBM A/S 400. Neither the controllers nor the drives are stand-alone peripheral devices. Instead they operate solely in the 9335 Direct Access Storage System. Moreover, neither operates without the other.

IBM imports the individual drives and controllers separately. Among other things, each drive contains three 14–inch magnetic hard disks and 12 read/write heads. Each controller contains a microprocessor, as well as both random-access read/write and read-only memory. In addition, both devices have their own "power supplies" (voltage transformers), cooling equipment, and various data input and output ports. Although each controller and drive has a flat-bottomed housing, they are specifically designed for mounting on slide rails within the rack enclo-

---

**1.** This picture actually appears to illustrate a component other than the drives and controllers at issue in this case. However, IBM offered it to the trial court as an illustration of how the drives and controllers are mounted within the rack enclosure. This court uses the picture for the same purpose.

sure. Thus, after importation the controllers and drives are fitted with cables and the slide assemblies required to slide-mount them in the rack enclosure.

From April 1985 until December 1986, Customs consistently liquidated the subject drives and controllers—all at the Port of Minneapolis, Minnesota—as "[p]arts of automatic data-processing machines," duty-free under Item 676.54, TSUS. Thereafter, however, for subject merchandise that entered at the Port of Minneapolis and at Logan Airport in Boston, Customs liquidated the subject drives and controllers as "[o]ffice machines not specially provided for," under Item 676.30, TSUS, at a duty rate of 3.7% *ad valorem.*

IBM timely filed protests of liquidation at the higher rate, which Customs denied. In 1994, IBM sought review in the Court of International Trade. In that court, IBM contended that Customs had an "established and uniform practice" of classifying the subject drives and controllers as "[p]arts of auto-matic data-processing machines." Therefore, IBM maintained, Customs could only reclassify them if it first supplied notice under 19 U.S.C. § 1315(d) (1988). Regardless of the notice requirement, IBM also argued that Customs had incorrectly classified the merchandise. On cross-motions for summary judgment, the Court of International Trade found no established practice and determined that Customs had properly classified the imports as "[o]ffice machines not specially provided for." IBM appeals. Because this court determines that Customs improperly classified the imports, it need not consider whether the Court of International Trade properly determined that Customs had no "established and uniform practice."

## II.

At the time of entry of the imports, the Tariff Schedules of the United States, Schedule 6, Part 4, Subpart G ("Office Machines") provided:

Typewriters not incorporating a calculating mechanism:

| | |
|---|---|
| 676.05 | Non-automatic with hand-operated keyboard |
| 676.07 | Other |

Addressing, numbering, dating, and check-writing machines:

| | |
|---|---|
| 676.10 | Addressing machines |
| 676.12 | Other |

Calculating machines; accounting machines, cash registers, postage-franking machines, ticket-issuing machines, and similar machines, all the foregoing incorporating a calculating mechanism:

| | |
|---|---|
| 676.15 | Accounting, computing, and other data-processing machines |
| | . . . . |
| 676.22 | Cash registers |
| 676.23 | Adding machines |
| 676.25 | Other |
| 676.30 | <u>Office machines not specially provided for</u> |

Parts of the foregoing:

| | |
|---|---|
| 676.50 | Typewriter parts |
| 676.54 | <u>Parts of automatic data-processing machines and units thereof, other than parts incorporating a cathode ray tube</u> |
| 676.56 | Other |

---

(emphasis added). The duty for imports under Item 676.30, "Office machines not specially provided for," was 3.7% *ad valorem.* On the other hand, imports under Item 676.54, "Parts of automatic data processing machines and units thereof," entered duty-free. Headnote 2(a) of Subpart G provided the following pertinent definition:

[T]he term "office machines" refers to machines which are used in offices, shops, factories, workshops, schools, depots, ho-tels, and elsewhere, for doing work concerning the writing, recording, sorting, filing, mailing of correspondence, records, accounts, forms, etc., or for doing other "office work," *and which have a base for fixing or placing them on a table, desk, wall, floor, or similar place* . . . .

(Emphasis added.)

Using this definition as a starting point, this court first addresses whether the subject

drives and controllers fit within the "office machines" provision. When in operation, the drives and controllers perform functions within the broad description of "office work" specified for "office machines" in Headnote 2(a). Specifically, the imports do work concerning writing, recording, sorting, filing, and other office work. However, standing alone, neither the drive nor the controller can perform "office work." Instead, a controller must be connected to at least one drive to form the Direct Access Storage System, which must in turn be connected to a central processing unit such as the IBM AS/400 computer.

■ Nevertheless, the appropriate inquiry is whether the articles perform "office work" in operation, not whether they can do so standing alone. In *Intel Singapore, Ltd. v. United States,* 83 F.3d 1416 (Fed.Cir.1996), this court pronounced this rule in a similar case. In *Intel,* an importer sought classification of microprocessor circuit boards as "[p]arts of automatic data-processing machines and units thereof," Item 676.54, rather than as "[a]ccounting, computing, and other data-processing machines," Item 676.15. *See id.* 83 F.3d at 1417. The importer argued that the boards were not "computing machines" because, standing alone, they could perform no computing functions. *See id.* 83 F.3d at 1418. However, this court concluded that the "computing machines" provision "is not limited to devices that possess the stand-alone capability to compute," but "also encompasses devices that perform useful computing work when installed within a computer system." *Id.* (relying on *National Advanced Systems v. United States,* 26 F.3d 1107, 1110 (Fed.Cir.1994)). Similarly in this case, the "office machines" provision covers articles that perform "office work," irrespective of whether those machines perform the work by themselves or in connection with other machines. Thus, the drives and controllers perform "office work."

Performance of office work, however, is not the only requirement of the "office machines" definition. Headnote 2(a) also requires that "office machines" have "a base for fixing or placing them on a table, desk, wall, floor, or similar place." Customs admitted in its answer to IBM's complaint that the drives and controllers do not have such a base. Later Customs filed a motion below to amend its answer in that respect, but the trial court denied the motion. IBM argues that Customs' admission should end the analysis. The admission, however, did not end the trial court's analysis.

The trial court found that—although perhaps lacking a base at the time of importation—the drives and controllers acquire a base afterwards. The trial court found that the rack enclosure in which the controllers and drives are mounted after importation is a "base," because "it allows them to be placed on and/or fixed to the floor." 968 F.Supp. at 742. The trial court premised its conclusion on General Interpretative Rule 10(h), which states:

> [U]nless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished.

General Rule 10(h) modifies the general principle that Customs classifies merchandise according to its condition when imported. *Cf. United States v. Citroen,* 223 U.S. 407, 414–15, 32 S.Ct. 259, 56 L.Ed. 486 (1912) (applying the general rule). The trial court reasoned that the addition of the rack enclosure "base" after import meant that the drives and controllers entered as *unfinished* "office machines."

IBM notes that General Rule 10(h) only applies when the context of the tariff description does not require otherwise. Therefore, IBM reads the "base" requirement in Headnote 2(a) as descriptive "context" that "requires otherwise," thereby making General Rule 10(h) inapplicable. Accordingly, IBM contends, an article without a base at the time of importation cannot fall within the "office machine" definition.

■ The Court of International Trade correctly resolved this issue against IBM. The

trial court correctly decided that General Rule 10(h) allows classification of an article as an "office machine" even without a base at the time of importation—as long as a base is *certain* to be added later. *Cf. ACME Shear Co. v. United States,* 63 C.C.P.A. 12, 524 F.2d 1212, 1214 (CCPA 1975) (applying the rule that imported merchandise can be classified as an "unfinished" article only when it " 'has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or that class of articles alone' " (quoting *American Import Co. v. United States,* 26 C.C.P.A. 72, 74 (1938))). In other words, if an article is "unfinished" at importation only because it lacks a base, it qualifies as an unfinished "office machine"— and therefore as an "office machine." Because this construction reasonably gives effect to both Headnote 2(a) and General Rule 10(h), the "context" of Headnote 2(a) does not *require* otherwise."

■ Although correctly determining that the drives and controllers would satisfy the office machine definition if given a base after import, the Court of International Trade did err, however, in identifying the rack enclosure as a "base" for these imports. Headnote 2(a) requires that it is the article to be classified as an "office machine" that must have a "base." In this case, the rack is not a component of the drives nor of the controllers. Rather, it is a component of the Direct Access Storage System. Indeed, the base of the rack is what qualifies the system as an "office machine." Because the rack is not even a part of the imports, but of the system instead, the trial court's identification of the rack enclosure as the base of a drive or a controller is error.

Customs makes another attempt to qualify the drives and controllers as "office machines." Before this court and in its motion to amend its answer below, Customs posited that the drives and controllers do have a base—in the form of the slide rails that IBM affixes to the housing after importation. Customs sees these rails as "a base for fixing or placing" the drives and controllers "on a

... similar place"—namely the corresponding slide rails in the rack enclosure. Headnote 2(a) does use broad language suggesting that a base can fix the import "on a table, desk, wall, floor, or similar place." This court has considerable difficulty in classifying the rack as a place similar to a table, desk, wall, or floor. Under Customs' argument, this court would need to reach that conclusion to qualify the imports as "office machines." However, this court need not decide the issue. Even assuming that the imports may fit within the class "[o]ffice machines not specially provided for," the drives and controllers fit much better as "[p]arts of automatic data-processing machines and units thereof."

General Interpretative Rule 10(c) states:

[A]n imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

. . . .

(ii) comparisons are to be made only between provisions of coordinate or equal status, i.e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading . . . .

General Interpretative Rule 10(ij) complements General Rule 10(c) for "parts" provisions:

[A] provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

These rules apply because the imports fit comfortably within the designation "[p]arts of automatic data-processing machines and units thereof." Moreover this classification fits the imports more snugly than the class "[o]ffice machines not specially provided for." These two conclusions, however, demand some additional reasoning.

As noted above, General Rule 10(ij) states that "a provision for 'parts' of an article

covers a product solely or chiefly used as part of such article." This formulation poses the question: Are the drives and controllers "solely or chiefly used" as part of an "automatic data-processing machine"? The record shows that the subject drives and controllers are used *solely* as components of IBM's Direct Access Storage System, which in turn is at least chiefly used as a component of IBM's A/S 400 computer system. The A/S 400 is "an automatic data-processing machine." Thus, these drives and controllers qualify as "[p]arts of automatic data-processing machines." [2]

This court's conclusion about the classification of these imports does not mean that disk drives and controllers will always find their best classification under the "parts" heading. Rather, the linchpin is whether the article can be classified under the "parts" heading in the first place. This classification, in turn, depends on whether the article will be "solely or chiefly used" as part of another article as set forth in General Rule 10(ij). Thus, for example, disk drives and controllers which serve chiefly as stand-alone peripherals would not likely qualify as "parts."

Having concluded that the imports satisfy the "parts" designation, this court now turns to why that "parts" heading is more appropriate than the "office machines" heading. In accord with the general proposition favoring classification in the provision that most specifically describes an article, General Rule 10(ij) reiterates that a "parts" provision "does not prevail over a specific provision for such part." The Court of International Trade concluded that the provision for "[o]ffice machines not specially provided for" is a "specific provision" and more specific than the provision for "[p]arts of automatic data-processing machines." *See* 968 F.Supp. at

743. To the contrary, however, the "office machines" provision is not a specific provision for these drives and controllers. In any event, "[p]arts of automatic data-processing machines" is more specific.

■ The "office machines" provision is a basket provision. Indeed, its language exhibits the classic basket provision format, i.e., "articles, not specially provided for." *See Ideal Toy Corp. v. United States*, 58 C.C.P.A. 9, 433 F.2d 801, 804 (CCPA 1970); *see also Sharp Microelectronics Tech., Inc. v. United States*, 122 F.3d 1446, 1450 (Fed.Cir.1997). A basket provision is not a specific provision. This rule is a corollary to General Rule 10(ij). As this court's predecessor has explained, "were ... general basket provisions deemed 'specific provisions' within the meaning of [General Rule] 10(ij), no imported merchandise could ever be classified as a 'part.'" *Ideal*, 433 F.2d at 804.

■ Furthermore, the rule of relative specificity in General Rule 10(c) dictates the same result. Under General Rule 10(c)(ii), a comparison of specificity applies "only between provisions of coordinate or equal status." The superior heading for "[p]arts of automatic data-processing machines" is "[p]arts of the foregoing"—essentially meaning "parts of office machines." The parts provision thus is more specific than the coordinate office machines provision because under General Rule 10(c), "parts" provisions prevail over "basket" provisions. *See Ideal*, 433 F.2d at 804; *United States v. Porter*, 68 C.C.P.A. 15, 645 F.2d 52, 56 (CCPA 1981). These rules accord with the more general principle that "the more specific provision is the one having requirements which are more difficult to satisfy." *United States v. Simon Saw & Steel Co.*, 51 C.C.P.A. 33, 40 (1964).

---

**2.** Because they are also parts of the Direct Access Storage System, the drives and controllers could also fit under Item 676.56 ("[o]ther" parts). However, Item 676.54 ("[p]arts of automatic data-processing machines") is more specific than, and therefore prevails over, Item 676.56. In addition, because the parties have not presented the issue, this court does not address whether either the drives or the controllers have a "calcu-

lating mechanism" rendering them (and thus the Direct Access Storage System) eligible for classification as "automatic data-processing machines" under 676.15, TSUS. If the imports fit under that heading, *National Advanced Systems v. United States*, 26 F.3d 1107, 1112 (Fed.Cir. 1994), would govern. In that case, this court held that Item 676.15, in contrast to Item 676.30 at issue here, prevails over Item 676.54.

The case of *Daisy–Heddon, Div. Victor Comptometer Corp. v. United States,* 66 C.C.P.A. 97, 600 F.2d 799 (CCPA 1979) does not mandate a different result. Reconciling General Rules 10(h) and 10(ij), *Daisy–Heddon* classified, in the face of a provision for "parts of fishing reels," an article as an "unfinished" fishing reel only if it was a "substantially complete" fishing reel. *Id.* 600 F.2d at 802–03. In this case, the record shows that the subject drives and controllers are "substantially complete," and as discussed above, may even stretch to be "substantially complete" office machines. The result here is different from *Daisy–Heddon* because the "office machines" provision is not a specific provision. In *Daisy–Heddon,* the "best" classification was in the non-"parts" provision, and thus the overriding question was whether the merchandise could correctly be classified in that provision in the first place. Here, however, the non-"parts" provision at issue is a basket provision. Thus, the fact that the subject merchandise may be "substantially complete" and can therefore be classified as "unfinished" is irrelevant in the face of the more specific "parts" provision.

*Daisy–Heddon* also refutes an idea suggested by the trial court's analysis—that an individual drive or controller is an "unfinished" Direct Access Storage System or even an "unfinished" IBM AS/400 computer system. Although the imports are indeed "substantially complete" drives and controllers, an individual drive or controller cannot qualify as a "substantially complete" Direct Access Storage System or AS/400 computer system. Thus, the imports are only components of those systems.

### III.

For the foregoing reasons, this court reverses the judgment of the Court of International Trade.

### COSTS

Each party shall bear its own costs.

*REVERSED.*